IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CINEMA SCENE MARKETING & PROMOTIONS, INC, BRAD DERUSSEAU, MICHAEL HOLMES, JOSEPH ROSS, AND BRUCE SIMS,<br><br>      Plaintiffs,<br><br>      v.<br><br>CALIDENT CAPITAL, LLC, DREW N. BAGOT, AND DAVID LAI,<br><br>      Defendants. | Case No. 16-2759-JAR |

## MEMORANDUM AND ORDER

Plaintiffs filed this action alleging Defendants lied to induce them to sign a buy-out letter of intent ("LOI") with Defendants, who neither had the money to buy Plaintiffs' business nor the intent to follow through with the purchase. Defendants filed counterclaims, alleging Plaintiff breached Paragraphs 10 and 15 of the LOI (Counterclaims II and I, respectively) and negligently misrepresented that they had an existing business relationship with a third-party competitor and would reach an agreement with that competitor to induce Defendant to execute the LOI (Counterclaim III). Before the Court is Plaintiffs' Motion to Dismiss Counterclaim III (Doc. 47). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court denies the motion.

**I.     Factual Background**

The following facts are alleged in the Counterclaim (Doc. 29) and assumed to be true for purposes of deciding this motion.

Plaintiff Cinema Scene Marketing & Promotions, LLC ("Cinema Scene") provides movie theater digital marketing/advertising and movie theater concessions. Its principals are Plaintiffs

Brad Derusseau, Michael Holmes, Joseph Ross, and Bruce Sims ("CS Principals"; collectively with Cinema Scene, "Plaintiffs"), all of whom are residents of Johnson County, Kansas.

Defendant Calidant Capital, LLC ("Calidant") is a Texas capital investment limited liability company with two members, Drew Bagot and David Lai (collectively with Calidant, "Defendants").

In early 2015, Plaintiffs circulated a solicitation seeking to attract potential investors to purchase ownership interest in Cinema Scene. Defendants responded to the solicitation and requested additional information on the company.

On June 4, 2015, Plaintiffs, through their representative Dave Kakareka, sent Defendants an "Information Memorandum" which contained information about Cinema Scene's operations, information about Cinema Scene's financial records from previous years, and representations about Cinema Scene's predicted financial success moving forward.

On June 30, 2015, Defendants submitted a non-binding Indication of Interest ("IOI") to Plaintiffs. In their IOI, Defendants proposed that the Transaction (*i.e.*, the purchase of Cinema Scene) eventually be consummated with "a combination of equity provided by [Defendants] and conservative third-party senior debt."[1] The CS Principals would stay on as Cinema Scene employees following the purchase by Defendants. Plaintiffs indicated that they had received IOIs from other potential investors and were considering Defendants among multiple groups of investors.

On August 25, 2015, the parties met in Overland Park, Kansas. The CS Principals presented details of Cinema Scene's operations to Bagot and Lai who, in turn, presented their strategic vision for executing the Transaction. In this meeting, Defendants recognized Cinema

---

[1] Doc. 29 at 13, ¶ 23.

Scene's digital marketing product line had significant competition from another market participant, National CineMedia ("NCM"). Because NCM could impede Cinema Scene's growth in the digital marketing sector and pose a threat to the Transaction, CS Principal Ross orally represented to Defendants that Plaintiffs had a close relationship with the president of NCM and could reach a deal with NCM which would alleviate the threat of competition. The parties decided to actively work toward reaching a formal agreement for the sale of Cinema Scene to Defendants. Accordingly, Plaintiffs sent Defendants their financial information to begin the due-diligence process and Defendants set out to obtain third-party investors.

Immediately following the August 25, 2015 meeting, Defendants contacted numerous investors to obtain third-party financing for the Transaction. In September 2015, Defendants obtained a non-binding commitment letter from a third-party investor — Saratoga Investment Corp. ("Saratoga") — to support Defendants' acquisition of Cinema Scene. Defendants continued to solicit other third parties to participate in the Transaction as investors and/or strategic partners.

On September 4, 2015, Defendants submitted a proposed binding LOI to Plaintiffs for the acquisition of Cinema Scene.

On October 26, 2015, Ross had a dinner meeting in Dallas, Texas with Bagot and Lai. Plaintiffs, through Ross, represented for a second time that Plaintiffs had a close relationship with NCM executives and would strike a deal with NCM to neutralize Cinema Scene's primary competition in the digital marketing sector.

On November 2, 2015, Plaintiffs, through Ross, represented for a third time to Defendants, via email, that, by virtue of his relationship with NCM's executive team, Plaintiffs

3

were on the verge of reaching an agreement with NCM that would virtually eliminate Cinema Scene's competition in the digital marketing sector.

On November 9, 2015, Plaintiffs represented to Defendants for a fourth time that Plaintiffs were on the verge of closing a deal with NCM that would have "game-changing implications for the growth of the company."[2]

The parties executed the LOI on November 11, 2015.  The LOI included a provision that Defendants' obligation to complete the Transaction was subject to satisfactory due-diligence review of Cinema Scene by Defendants and their lenders.  The LOI obligated the parties to negotiate in good faith toward a definitive stock purchase agreement ("DPA") —and other documents incident to such purchase agreement—in conformance with guidelines provided in the LOI.  The LOI also contained an exclusivity term whereby Cinema Scene agreed not to negotiate with parties other than Defendants for a period of ninety days following execution of the LOI.

In December 2015, Defendants worked diligently with counsel to draft legal documents necessary for the closing of the Transaction.  The parties negotiated and traded revisions to the DPA throughout January 2016.  Although Defendants considered many of Plaintiffs' revision requests unreasonable or a deviation from industry standard, Defendants remained ready, willing, and able to consummate the Transaction.

By February 2016, negotiations broke down due to Plaintiffs' increasing demands regarding employment agreements, salaries for the CS Principals, and post-Transaction income tax distributions.  Despite Plaintiffs' outward bad faith, Defendants had significant time and

---

[2] *Id*. at 16, ¶ 46.

resources invested in the Transaction and thus were still ready, willing, and able to consummate the Transaction.

On March 1, 2016, the parties extended the Exclusivity and Good Faith Provision to March 15, 2016.

On or about March 3, 2016, AMC Theatres ("AMC") publicly announced its acquisition of Carmike Cinemas (the "Merger"), which injected significant risk and uncertainty into the Transaction as a whole. On March 7, 2016, the parties conferred and agreed that the Transaction could still be consummated but would require amendments to account for the anticipated loss of revenue due to the Merger. From March 25 through early April, 2016, Defendants worked to restructure the Transaction with Plaintiffs.

Defendants sent Plaintiffs a revised LOI on April 20, 2016. Plaintiffs did not respond.

From May 10 through August 15, 2016, unbeknownst to Defendants, Plaintiffs worked to engage other potential buyers of Cinema Scene.

On August 15, 2016, Plaintiffs told Defendants to compile a final proposal for the Transaction. On September 9, 2016, Defendants submitted the revised LOI per Plaintiffs' request. On September 21, 2016, Plaintiffs informed Defendants that they decided to move forward on a similarly structured deal with Vision Media.

Defendants then demanded payment from Plaintiffs for fees incurred in connection with the Transaction. Plaintiff filed this suit alleging fraudulent misrepresentation regarding Defendants' intent to consummate the Transaction. Defendants filed counterclaims.

**II.     Legal Standard**

Plaintiffs move to dismiss Counterclaim III for failure to state a claim under Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss for failure to state a claim, a complaint must present

factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[3] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[4] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully,"[5] but requires more than "a sheer possibility."[6]

The plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*[7] seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'"[8] *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[9]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[10] Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[11] Second, the court

---

[3] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in the original).

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[6] *Id.*

[7] 550 U.S. 544 (2007).

[8] *Robbins v. Okla*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

[9] *Id.* (citing *Twombly*, 550 U.S. at 556).

[10] *Iqbal*, 556 U.S. at 678.

[11] *Id.* at 678–79.

must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[12] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[13]

## III.   Analysis

In Kansas, a negligent misrepresentation claim may be brought against a person "who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions."[14] To state a plausible claim for negligent misrepresentation, a plaintiff must allege: 1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating it; 2) the party receiving the false information reasonably relied on it; 3) the person relying on the false information is a person or one of a group of persons for whose benefit and guidance the information is supplied or a person or one of a group of persons to whom the person supplying the information knew the information would be communicated by another; and 4) the party receiving the information suffered damages.[15] Plaintiffs challenge the sufficiency of Defendants' allegations of reasonable reliance and materiality. They also claim facts alleged in support of the contract claim made the negligent misrepresentation claim implausible.

---

[12] *Id.* at 679

[13] *Id.* at 678.

[14] *Mahler v. Keenan Real Estate, Inc.*, 876 P.2d 609, 616 (Kan. 1994) (adopting the tort of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552 (1976)).

[15] *Id*. citing PIK Civ. 4th 127.43.

### A. Reasonable Reliance

Plaintiffs argue that Defendants' reliance allegations are nothing more than threadbare legal conclusions. The Court disagrees. Defendants allege they decided to enter into a binding LOI with Plaintiffs based in part on Plaintiffs' representations about eliminating the threat of competition from NCM. Defendants also alleged these representations affected the terms of the LOI. Because Defendants have identified the actions they took in reliance on the misrepresentations, they sufficiently allege facts to support the reliance element.[16]

Plaintiffs' argument that Defendants' reliance was not reasonable because Defendants secured a contractual right to investigate and obtain the necessary information that the statements were false lacks merit at this juncture. "Kansas law allows the recipient of misrepresentations to justifiably rely upon their truth without investigation unless he knows or has reason to know of facts which make his reliance unreasonable."[17] Moreover, whether Defendants' reliance on the NCM representations was reasonable cannot be decided on a motion to dismiss and is a question better resolved on a motion for summary judgment when the Court can consider all the facts surrounding Defendants' decision to enter into the LOI and consummate the Transaction.[18] Accordingly, the Court rejects this basis for dismissal of Counterclaim III.

### B. Materiality

Plaintiffs argue the NCM representations were not material because they did not influence Defendants' decision to close the transaction. Defendants say this is a strawman's

---

[16] *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1256 (10th Cir. 2016) (holding allegations "identify[ing] the actions the plaintiffs took in reliance on [the] misrepresentations, [and] detail[ing] the injuries they suffered as a result" were sufficient to satisfy Rule 9(b)).

[17] *Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 812 F. Supp. 185, 188 (D. Kan. 1993) (citing *Goff v. Am. Savs. Ass'n of Kan.*, 561 P.2d 897, 903 (1977); *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1158 (10th Cir. 1985)).

[18] *LNV Corp. v. Curry*, No. 09-2471-JAR, 2010 WL 11565487, at *4–6 (D. Kan. Aug. 17, 2010).

argument because their subsequent willingness to close the Transaction has no bearing on Plaintiffs' liability for their pre-LOI misrepresentations. The Court agrees. Plaintiffs' arguments conflate two separate transactions, entry into the LOI and execution of the underlying Transaction.

Defendants assert that "[a] deal between Plaintiffs and NCM would have greatly increased Cinema Scene's potential for growth into the digital marketing segment."[19] They also assert these representations affected the negotiation and the specific terms in the LOI, and that they would not have entered into the binding LOI or agreed to the $11,000,000 valuation had Plaintiffs not made these representations.[20] These allegations sufficiently state materiality. A representation is material when it relates to some matter that is so substantial as to influence the party to whom it is made.[21] The inclusion of a due-diligence provision regarding representations suggests the NCM representations were material. As for Defendants' decision to proceed with the Transaction despite there being no deal between Plaintiffs and NCM, while this may well indicate that these representations were not material, an equally plausible explanation is the idiom "in for a penny, in for a pound."[22]

### C. Alternative Claims

Finally, Plaintiffs argue that Defendants' "ready, willing, and able to close" statements made in support of their breach-of-contract claims make their negligent misrepresentation claim implausible. The Court disagrees. Defendants have sufficiently alleged the elements required to state a plausible claim for negligent misrepresentation. As alleged, Defendants' claims appear

---

[19] Doc. 29 at 40, ¶ 228.

[20] *Id*. at 41, ¶¶ 234–36.

[21] *Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008).

[22] Doc. 29 at 26, ¶ 116 ("At this point, despite Plaintiffs' consistent bad faith in negotiating the Transaction, Defendants had significant time and resources invested in the Transaction and, accordingly, were still ready, willing, and able to consummate the Transaction.").

consistent. Even if they are inconsistent, federal pleadings rules allow a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically"[23] or "state as many separate claims or defenses as it has, regardless of consistency."[24]

## IV. Conclusion

Defendants have pled facts sufficient to go forward with their negligent misrepresentation claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion to Dismiss Counterclaim III (Doc. 47) is DENIED.

**IT IS SO ORDERED.**

Dated: <u>February 9, 2018</u>

                                         S/ Julie A. Robinson
                                         JULIE A. ROBINSON
                                         UNITED STATES DISTRICT JUDGE

---

[23] Fed. R. Civ. P. 8(d)(2).

[24] Fed. R. Civ. P. 8(d)(3).